Norberto Ramirez v. The State of Texas

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-509-CR

NORBERTO RAMIREZ APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Pursuant to a search warrant, police found more than 400 grams of cocaine in a garage attached to a house and found five handguns, three of which were loaded or in close proximity to ammunition, in the bottom drawer of the dresser in the northeast bedroom of the house.  They also found more than $7,000 in cash in the same drawer.  They arrested Appellant Norberto Ramirez in the yard outside the house.  Appellant filed a motion to suppress his confession.  After the trial court denied Appellant’s motion to suppress his confession, he entered an open plea of guilty to the trial court to the offense of possession of over 400 grams of cocaine with intent to deliver.  He pled not true to the deadly weapon allegation.  The trial court accepted the plea of guilty and further found that Appellant used or exhibited a deadly weapon in the commission of the offense.  The trial court sentenced Appellant to thirty years’ confinement in the Institutional Division of the Texas Department of Criminal Justice.

Appellant brings four points on appeal, arguing that the trial court erred by denying his motion to suppress the statement that he gave to the police officers, that the evidence is insufficient to support the deadly weapon finding, that he was denied the right to testify on his own behalf regarding the deadly weapon issue, and that the trial court erroneously admitted evidence of an extraneous offense during the punishment phase.  Because we hold that the evidence is legally insufficient to support the deadly weapon finding, we modify the judgment to delete the deadly weapon finding.  Because we hold that the trial court did not otherwise err, we affirm the trial court’s judgment as modified.

Voluntariness of Appellant’s Statement

In his first point, Appellant argues that his statement to the police was involuntary because the police failed to adequately warn him of his constitutional rights, coerced him into giving the statement, and illegally arrested him.  Article 38.21 of the Texas Code of Criminal Procedure provides that a statement of an accused may be used in evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion.
(footnote: 2)
Legality of the Arrest

Appellant argued before the trial court that the officers provided faulty information which misled the magistrate who signed the warrant.  Specifically, Appellant argued that the target of the search warrant was Juan Maldonado.  He argued that the detective signed an affidavit in support of the warrant and that the affiant swore 

that the person that we’re looking [for] is one Juan Luis Maldonado.  He also swore they had made an investigation.  He identified the subject, the search of this warrant, and the point is that was strictly based on a license check on a vehicle that was at the residence here in question.  And that is all the investigation that this detective did, even though he swore under oath in front of Magistrate Judge Robert Cortez when everything was true and correct, when it wasn’t.

He had not made a due diligent investigation to find out where this person was, and they also made the basis because Mr. Jose Luis Maldonado has a criminal history in Tarrant County. . . .  They got a no-knock approval by the Judge, assuming it was Mr. Maldonado, with a history of assaultive offenses.  It turned out to be totally incorrect.  Mr. Maldonado was not involved in any of this, and I’m saying that, by itself, the Court shouldn’t condone . . . faulty detective work like this, where they swore to something that is false.

At best, they didn’t do their homework and you don’t tell a judge everything is true and correct to obtain a warrant, and we’ll clear it later, or it didn’t make any difference afterwards.  So I just assumed the detective was going to be here today.

Before any officer testified at the hearing on the motion to suppress, the trial court noted that the warrant authorized not only the arrest of Maldonado, but also “others accused of concealing said controlled substance namely cocaine.”  The trial court found that the warrant itself was not limited to Maldonado but also included others.  Appellant’s trial counsel stated, “I agree a hundred percent, Judge.  That is not my argument.  My argument is the faulty information that a detective used to obtain the warrant . . . even though some of it may be true.“  At that point, the trial court announced that it would not rule on that question but would “hold that until we actually bring this officer in.”

Later, Officer Blaisdell, the affiant, testified.  Appellant never again raised the question of the veracity of the statements in the affidavit supporting the warrant.  The State argues that Appellant’s failure to address the issue when Officer Blaisdell was on the stand or at any other time after the court announced that it would not rule until evidence had been presented constitutes waiver.  Because Appellant did not give the trial court a timely opportunity to rule on the issue, we agree that he has forfeited this complaint.
(footnote: 3)
Adequacy of the Warnings

Appellant also contends within his first point that the police failed to adequately advise him of his constitutional rights.  Article 38.22, section 2(b) of the Texas Code of Criminal Procedure provides that no statement by an accused as a result of custodial interrogation is admissible unless the accused “prior to and during the making of the statement, 
knowingly
, intelligently, and voluntarily waived” the warning prescribed by subsection 2(a).
(footnote: 4)  Appellant argues that his waiver of his right to remain silent was not knowingly made  because he did not understand his rights when he agreed to waive them. In determining the voluntariness of the confession, we consider the totality of the circumstances.
(footnote: 5)  In reviewing a trial court’s ruling on a motion to suppress, we apply a bifurcated standard of review.  We do not engage in our own factual review.
(footnote: 6)  We therefore give almost total deference to the ruling of the trial court on questions of historical fact and review de novo the trial court’s rulings on questions of law and fact that do not turn on the evaluation of the credibility or demeanor of the witnesses.
(footnote: 7)
 Officer Perez testified that he read the 
Miranda
(footnote: 8) warnings to Appellant in Spanish and that Appellant indicated that he understood his rights and wanted to waive the right to make a statement.  When asked whether he felt compelled or forced to sign the statement, Appellant testified, “No, no.  Just all I had was nervousness.”  When asked whether he was aware that he did not have to sign a declaration, Appellant testified, “Well, yes, they did tell me because they said we want to know something that explained, you know, the situation.”  When asked whether anybody had threatened him to make a statement, he also testified, “Yes.”  Then he explained in response to the question concerning how he was threatened, “That I needed to give an explanation of what they had found, and for me to say what—what I felt because of what they found.”

He admitted that he signed the forms with the 
Miranda
 warnings on them, that he could read Spanish, and that he could read the warnings, but he said that he was too nervous to understand what his rights were on the day that he signed the statement.  He also testified that no one had threatened him with a gun or held a gun on him while he was signing the documents and that nobody hit him while he was signing the documents, although they had hit him earlier.  Then he admitted that the officer had read the rights to him, but at the hearing he said that there were two or three things that the officer had said while he was reading that Appellant did not believe were true.  Specifically, Appellant testified, “Well, yes, he did [read the warnings].  He read me the papers, but two or three things that I was able to hear, that it wasn’t like that.” Finally, the following exchange occurred,

Q.  . . . .  He read you the warnings on State’s Exhibit 2, correct? 

 

A.  Yes.

Q.  And he asked you if you understood them, too, right?

A.  Yes.

Q.  And you said you did understand them.  You told him that you understood them, didn’t you?

A.  Yes.

. . . .

Q.  . . . .  You said you understood the warning on State’s Exhibit 2. After that you wrote the statement on State’s Exhibit 1, correct?

In other words, this State’s Exhibit 1 came after State’s Exhibit 2?

A.  Well, when I signed that, it was the final thing.  That was it.

Appellant also testified that he had only received six years of education in Mexico.

Considering the record as a whole, we hold that the trial court did not abuse its discretion by ruling that Appellant’s waiver of his right to remain silent was made knowingly and that he was properly warned of his rights before signing the statement.

Coercion

Appellant also argues within his first point that his statement was a result of police coercion.  Appellant relies on the following evidence from his testimony.  He was in the yard when the officers approached.  The officers struck him with a pry bar and at least four officers knelt on his back and held him down for five minutes or so before they handcuffed him.  They then led him to a masked man dressed all in black without a visible uniform, and that forbidding individual took the custodial statement.  Appellant testified that the police told him that he “should cooperate and then that way [he] couldn’t get punished so hard.”  Appellant testified that when the officers were on top of him and had him handcuffed, he was afraid.  He also testified that when Officer Perez asked him to “tell us in your own words what happened,” he felt he had to do what Perez told him to do because he was afraid.  At the same time, however, Appellant testified that he did not feel compelled or coerced to sign the statement.  He was just nervous.  He admitted that he was aware that he did not have to sign the statement.  He testified that they wanted him to explain the situation and that was why he signed it.

The trial judge was free to believe either version of Appellant’s story, in whole or in part, as well as to determine the credibility and weight of the testimony of all the witnesses.
(footnote: 9)  As for the statement that Appellant “should cooperate and then that way he couldn’t get punished so hard,” if the trial judge believed that this was a promise and that it actually had been made, it is nevertheless a vague promise, not a specific promise, and not the kind of promise the courts have held constitutes an inducement that overcomes the will of a person accused of a crime.
(footnote: 10)
 Considering the record as a whole and the applicable law, we hold that the trial court did not err by denying Appellant’s motion to suppress the statement he signed.  We overrule Appellant’s first point.

The Deadly Weapon Finding

In his second point, Appellant argues that the evidence is legally insufficient to prove that a deadly weapon was used or exhibited during the charged offense.  The issue is whether the firearms in a dresser drawer in a bedroom inside a house were “used” to facilitate the possession of cocaine in the garage.  In their briefs, both the State and Appellant explained that in determining the sufficiency of the evidence to support a deadly weapon finding in a possession of contraband case, courts should consider a number of different factors, including (1) the type of firearm involved; (2) whether the firearm was loaded; (3) whether the firearm was stolen; (4) the proximity of the firearm to the drugs, drug paraphernalia, drug manufacturing material, or the proceeds allegedly earned from the sell of the drugs; (5) the accessibility of the firearm to whomever controlled the premises; (6) the quantity of drugs involved; and (7) any evidence that might demonstrate an alternative purpose for the presence of the firearms.
(footnote: 11)  Police found five firearms in a dresser drawer in the northeast bedroom of the house that was the subject of the warrant.  Some of the firearms were loaded; some of them were not.  In the same drawer, officers found $7,533 in cash.  One of the officers, Officer Lucio, testified that he believed that the bedroom was Appellant’s bedroom.  No one else testified concerning whose bedroom the firearms and money were found in.  After the State rested and closed on the issue of the deadly weapon and after the trial court had ruled and entered an affirmative deadly weapon finding, Officer  Blaisdell testified that he had found Appellant’s passport in the same bedroom. 

The evidence shows that when the officers arrived, Appellant was not inside the house.  Rather, he was outside in the yard with his ten-year-old brother. 
 Officer Lucio testified that the cocaine and “dope notes” were found in a garage attached to the house on the property where Appellant was located.
  At the time that the trial court made the deadly weapon finding, nothing but Officer Lucio’s speculation connected Appellant to the bedroom.  No one other than Officer Blaisdell testified that he or she had seen Appellant’s passport in the bedroom.  All of the drugs and all of the notes connected to the drugs were found in the garage.

Officer Blaisdell signed the affidavit in support of the search warrant.  The affidavit and warrant were in the record before the trial court.  In his affidavit, Officer Blaisdell stated under oath that Jose Luis Maldonado possessed and controlled the cocaine in question at the house that was the subject of the warrant.  A confidential informant had told Officer Blaisdell that Maldonado was involved in the distribution of cocaine and that the informant had personally observed Maldonado in possession of and distributing cocaine from within the Dell Street residence, which was the subject of the warrant.  Officer Blaisdell swore that he met with the confidential informant and that the informant specifically pointed at the Dell Street house.  Officer Blaisdell swore that he corroborated much of the informant’s information through surveillance and independent investigation.  He swore that he conducted a surveillance on the Dell Street address and observed Maldonado arrive at the residence and go inside.  The informant also advised Officer Blaisdell that the informant had personally been inside the Dell Street house within seventy-two hours of the issuance of the warrant and that the informant had personally witnessed Maldonado in possession of and selling quantities of cocaine inside the house. 

Officer Blaisdell stated in his affidavit, “Said residence is located in the City of Fort Worth, Tarrant County, State of Texas which said controlled substance namely Cocaine is possessed and under the control of Maldonado, Jose Luis . . . .”

The trial judge stated without contradiction, “The warrant, in fact, is made by Bruce W. Blaisdell, who had received information from a confidential informant concerning Juan Jose Luis Maldonado who resides at 2405 Dell Street.”

Appellant admitted that he possessed the cocaine.  Nothing in the record suggests that Appellant possessed the cash that was in the bureau drawer or the firearms that were in the bureau drawer except Officer Lucio’s speculation and Officer Blaisdell’s claim, after the trial court’s ruling, that he found Appellant’s Mexican passport in the same room.

The house is a small house, and the garage is attached to it.  There is no testimony that the officers verified the ownership of the house, the name on the utility service, or, other than Lucio’s speculation and Officer Blaisdell’s claim of finding the passport in the northeast bedroom, that Appellant lived at the house or was in control of the northeast bedroom.  There is no evidence that the firearms were stolen.  There is no evidence about who controlled the premises other than Officer’s Blaisdell’s sworn statement in his affidavit that Maldonado did.  Despite the fact that more than 400 grams of cocaine was involved, neither weapons, nor contraband, nor a large amount of cash was found on Appellant’s person.  There is no showing of who actually possessed the firearms, although Blaisdell stated in his affidavit that 

the confidential informant advised your affiant that Jose L. Maldonado[ ] has bragged about shooting two people in the past.  That your affiant conducted a criminal history check on Jose L. Maldonado and learned that in 1991, Jose L. Maldonado was charged with two attempted murders . . . .  Jose L. Maldonado has been arrested for assault with bodily injury, in the past . . . . 

Nothing in the record suggests that Appellant was armed on either the day in question or in the past.  There is no evidence of a criminal history involving firearms.  Additionally, there is no showing that Appellant was in actual control of the residence.  There is no showing that Appellant actually controlled the cash.  There is no showing of the source of the cash.  What the evidence does show is that the police found Appellant in the yard, and he admitted possession of the contraband in the garage.

As Judge Cochran pointed out in her 
Coleman
 concurrence, 

[T]riers of fact and reviewing courts must look for some evidence showing that the particular defendant’s actual or constructive possession of a deadly weapon did, in fact, further the drug trafficking operation.  Mere presence is not enough.  Proof showing simply the simultaneous possession of a gun and drugs does not suffice to establish, beyond a reasonable doubt, that the gun facilitated commission of the drug offense.
(footnote: 12)
 In the case now before this court, nothing shows that the firearms facilitated Appellant’s possession of the cocaine.  Consequently, we hold that under the limited facts of this case, the evidence is legally insufficient to support a finding that Appellant used a deadly weapon in the course of committing the offense of possession of more than 400 grams of cocaine with the intent to deliver or, in Judge Cochran’s words, legally insufficient to establish, beyond a reasonable doubt, that the firearms facilitated Appellant’s  commission of the drug offense.  We sustain Appellant’s second point.  Because of our disposition of this point, we do not reach Appellant’s third point.
(footnote: 13)
Extraneous Drug Offense

In his fourth point, Appellant contends that the trial court abused its discretion by admitting evidence during the punishment phase concerning an extraneous offense despite the State’s failure to prove an adequate chain of custody.  The State developed testimony showing that Appellant had been involved in another drug-related offense six months after the one at issue and introduced as exhibits the drugs seized in this second offense.  The officer who testified was the undercover officer who purchased the drugs, but he was not the same officer who marked the drugs as evidence.  Appellant objected that no proper chain of custody was established for these drugs.  Gaps in the chain of custody generally go to the weight and credibility of the evidence at issue, not its admissibility.
(footnote: 14)  We cannot say that the trial court abused its discretion by admitting the drugs at the punishment phase of this bench trial.  We overrule Appellant’s fourth point.

Conclusion

Having sustained Appellant’s second point, we modify the judgment to delete the deadly weapon finding.  Having overruled Appellant’s first and fourth points, we affirm the trial court’s judgment as modified.

LEE ANN DAUPHINOT

JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  March 23, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Tex. Code Crim. Proc. Ann.
 art. 38.21 (Vernon 2005).

3:
See
 
Tex. R. App. P.
 33.1(a); 
Mendez v. State
, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004);
 Mosley v. State
, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied, 
526 U.S. 1070 (1999).

4:
Tex. Code Crim. Proc. Ann.
 art. 38.22, § 2(b) (Vernon 2005) (emphasis added).

5:
Arizona v. Fulminate
, 499 U.S. 279, 285, 111 S. Ct. 1246, 1251 (1991); 
Wyatt v. State
, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000).

6:
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

7:
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002).

8:
Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).

9:
See State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

10:
See Martinez v. State
, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); 
see also
 
Drake v. State
, 123 S.W.3d 596, 603 (Tex. App.—Houston [14th 
Dist.] 2003, pet. ref’d).

11:
Coleman v. State
, 145 S.W.3d 649, 658-60 (Tex. Crim. App. 2004) (Cochran, J., concurring).

12:
Id.
 at 660 (Cochran, J., concurring).

13:
See
 
Tex. R. App. P.
 47.1.

14:
Lagrone v. State
, 942 S.W.2d 602, 617 (Tex. Crim. App.), 
cert. denied
, 522 U.S. 917 (1997).